## KENT et al. v. CONGDON et al.

(*Circuit Court, S. D. Iowa, C. D.*  December 12, 1887.)

PAYMENT—TO AGENT—AUTHORITY.

    In a suit to foreclose a mortgage the defense was payment. The evidence showed that the loan had been negotiated through a broker in Des Moines, Iowa, who had the general oversight of the loans of the plaintiff, collecting the interest and principal of all loans as they fell due; that the plaintiff had expected the broker to collect and remit the interest on the mortgage in suit, to urge its payment when due, and to receive the money, and forward it to plaintiff; that the defendant had never had any correspondence with plaintiff in regard to the loan; that the bond accompanying the mortgage was made payable at Westfield, New York; and that the defendant had paid to the broker,

upon his demand, the amount due, though the broker did not at the time of such payment have in his possession the bond and mortgage. *Held,* that such payment was a discharge of the mortgage.

In Equity. Bill for foreclosure of a mortgage.

*Willard & Fletcher,* for complainants.

*Runnels & Walker* and *W. H. Stiles,* for defendants.

SHIRAS, J. This suit was brought originally by Darius E. Kent for the purpose of foreclosing a mortgage on realty executed by the defendant Congdon, for the purpose of securing payment of a note or bond for $1,200 which came due May 1, 1885. After the filing of the bill the complainant named died, and the administrators of the estate were duly substituted as complainants. The defense is that on or about May 6, 1885, the defendant Congdon paid to H. R. Creighton, of Des Moines, the sum of $1,251.47, in full discharge of the mortgage debt; he being at the time the agent of the mortgagee, with authority to receive payment of the sum due.

The facts are that in 1879 the defendant Congdon, desiring to borrow the sum of $1,200, applied to the Union Loan Association of Des Moines to procure such loan for him. The business of procuring loans on the one hand, and of making investments therein for others, was carried on at Des Moines by one Hugh R. Creighton, mainly in the name of the Union Loan Association. The general plan of operations was to procure applications for loans, with statements of the situation, character, and value of the security offered, and these were sent by Creighton to various brokers in the eastern states, by whom they would be submitted to persons having money to loan. When a loan was thus placed, Creighton would be notified, and he would have executed a bond and mortgage to the person taking the loan, making the bond payable at the office of the brokers through whom the loan was placed. The money so loaned, after deducting the commission charged by Creighton, would be paid to the borrower, and thus the contract for the procurement of the loan would be completed.

In order to encourage investors to patronize the association or Creighton, the latter undertook the collection of the interest and principal of the loans thus made, and when necessary, carried through personally or supervised the foreclosure of the mortgages, looked after the insurance on the mortgaged property, the payment of the taxes, and the like. In the spring of 1885, Creighton absconded, when it was ascertained that he was a defaulter in a large amount; having carried on a systematic plan for defrauding those intrusting their affairs to his management. The money sent him by Congdon, in May, 1885, for the purpose of paying the debt due Kent, he had not forwarded, but had applied it to his own use; and the question for decision is whether Creighton, as the agent of Kent, had the authority to receive payment on the debt in question.

On part of complainants it is argued that throughout the entire transaction Creighton acted as the agent of the borrower. This position cannot be sustained, in view of the facts disclosed in the evidence. In the

in the capacity of agent for the borrower; but when the loan was obtained, the security executed and delivered, and the money paid to the borrower, his agency in this particular ceased. From the letters of Darius E. Kent to Creighton, introduced in evidence, it appears that the general care and oversight of the loans made by Kent through the agency of Creighton was intrusted to Creighton. Thus in a letter dated November 25, 1884, Kent names a number of loans needing attention, urges prompt renewals of insurance policies that had expired on all loans that were not at once paid, discusses an application for an extension of a loan; saying that he had written the party to apply to Creighton, and that, if he considered the security ample, the extension would be given. Under date of April 8, 1885, Kent again writes to Creighton, enumerating a number of loans that needed attention; and in fact such is the purport of all the letters introduced, and they are inconsistent with the theory that Creighton was not acting on behalf of Kent in looking after the investments made by Kent in Iowa.

But it is said that it does not appear that Kent had intrusted to Creighton the duty of collecting the sums coming due on his securities, and that authority to receive payment of moneys due cannot be inferred from the fact that Creighton exercised supervision over some special matters connected with the loans. It clearly appears from Kent's letters that Creighton was intrusted with the duty of foreclosing the mortgages when that became necessary. In the letter of November 24, 1884, Kent writes Creighton as follows:

"As I must use here some money, and also use other moneys already promised, I shall need at least $3,600 soon as I can get it from that, as per yours of eighteenth instant, now on hand, and from the Joseph Sherod, James Terell, Lucinda C. Taylor, and the December 1st interest. After that I shall be ready for more applications, as I have money."

April 8, 1885, Kent writes to Creighton, saying:

"Now, more in regard to the unpaid interest, as was due December 1, 1884. There is now unpaid me, as by my books, $722.75; and also the Lucinda Taylor mortgage should be paid at once. I find, on inquiry of S. & T., that all other parties have secured their interest; and, as my business through them to you has been far more than any other party, it would seem that I should not be left in arrears. Am hoping all now behind will surely be closed out this month, and no fail. Send drafts as soon as any is collected, not waiting for all at one time, as I am yet in at our bank. I hope you will notify all parties whose mortgages become due May 1st next they must be ready in time, or the mortgages will be foreclosed. There is no use dallying along. Men must pay when due."

These letters show that Kent expected Creighton to urge collection, to receive the money, and to forward it to him. Bearing in mind that the bonds and mortgages were by their terms made payable at the office of Smith & Tennant, Westfield, New York, it is clear that Creighton had no authority to demand or receive payment thereon unless so authorized by Kent himself; and as it clearly appears that Kent expected Creighton to collect and remit the interest as it fell due, and to push all delin-

procurement of the loan, it may well be said that Creighton was acting quents, the only reasonable conclusion is that Kent had authorized him to collect the sums due, and to forward the same to him as collected. That such was the understanding of Creighton is shown by the fact that he sent demands for payment to the defendant and others. Thus it appears that on the fifth of May, 1885, he sent to the defendant Congdon a postal-card, saying:

"Your loan of - - - - - - - $1,200
Interest, - - - - - - - 48

Was due May 1st, - - - - - - $1,248
Int. thereon and exchange, - - - - - - - 4

If paid before May 10th, - - - - - $1,252
"Please give prompt attention,
"Yours, truly, HUGH R. CREIGHTON."

The testimony also shows that the defendant never had any correspondence with Kent in regard to the loan, the payment of interest, or the like, but that Creighton sent him notice of the times when the interest came due, and the money therefor was sent to Creighton. When, therefore, the notice of the maturity of the loan was sent by Creighton, the defendant was entirely justified in believing that in demanding payment Creighton was acting in behalf of Kent.

In the letter already cited of April 8, 1885, Kent had written Creighton to "notify all parties whose mortgages became due May 1st next, they must be ready in time or the mortgages will be foreclosed," and the notice sent by Creighton to Congdon was only carrying out the express instructions given by Kent. In the same letter Kent instructs Creighton to forward all sums as soon as collected, and not to wait until all should be collected. It is clear, therefore, that Kent expected Creighton to receive payment on his behalf of the sums due, and it was for the purpose of having the payments made to him that Kent directed Creighton to notify all, whose debts matured on May 1st, that they must pay promptly. Congdon's debt matured at that date, and in making payment to Creighton he did just what Kent expected and wished him to do. If, according to the contention of complainants, it should now be held that Congdon made the payment to Creighton at his peril, because the bond was, by its terms, payable at Westfield, New York, or for the reason that Creighton had not possession of the bond and mortgage, this would be a fraud upon the defendant, for the reason that he was induced to make payments to Creighton by the conduct of the creditor. Having in fact authorized Creighton to make collections on these claims, and having, by the mode of conducting the business, authorized the defendant to believe that the condition in the bond, that payment was to be made at the office of the brokers in Westfield, New York, was waived, and that he (Kent) recognized payments made to Creighton as properly made, and having in fact expressly directed Creighton to make demand for payment of the debt due from Congdon, with others, maturing May

1, 1885, he cannot be permitted to claim that payments made to Creigh-ton were unauthorized, and therefore at the risk of the debtor.

The evidence sustains the plea of payment, and consequently the bill must be dismissed at cost of complainants.